JOHN MARYNCZAK, Plaintiff-Appellant, *v.* D & L TRANSPORT COMPANY *et al.*, Defendants-Appellees.

First District (4th Division)    No. 79-2405

Opinion filed March 19, 1981.

Michael W. Rathsack, of Chicago, for appellant.

Tim J. Harrington and Anton J. Valukas, both of Chicago (Mel E. C. Perretti, Robert J. Klovstad, and Marshall D. Ossey, of counsel), for appellees.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

The plaintiff, injured in an accident on the Stevenson Expressway in Chicago, sued the driver of a disabled car which had blocked two lanes of the expressway, the driver of a truck which struck the rear of the plaintiff's automobile and the truck driver's employer. The jury returned a general verdict for all defendants and also by answer to a special interrogatory found the plaintiff guilty of contributory negligence. The plaintiff appealed contending that (1) the use of the special interrogatory was unconstitutional; (2) the general verdict and the answer to the special interrogatory were against the manifest weight of the evidence; and (3) the court erred in refusing to submit certain of the plaintiff's allegations of negligence to the jury for consideration.

The accident in question occurred Saturday, January 12, 1974, at about 6 a.m. on one of the three southwest-bound lanes of the Stevenson Expressway. A car driven by Otto Buttlar, one of the defendants, went out of control and stalled blocking the right two lanes. Both the plaintiff, John Marynczak, and Robert Sutter, another defendant, were traveling in the same direction. Robert Sutter is an employee of D & L Transport Company, the third defendant. Sutter's truck collided with plaintiff's automobile and plaintiff was injured. In light of the issues presented on appeal, only the testimony of the plaintiff, Buttlar, Sutter, Prentice Smith, an eyewitness to the accident, and Police Officer Stokes is relevant.

The plaintiff Marynczak testified that he left home about 5:30 a.m., January 12, 1974. He drove to the Stevenson Expressway, intending to take

the Stevenson to Cicero Avenue. The day was cold and clear. "There was no fog or anything like that." The highway was "awful dry, was frozen dry." The traffic was light "all the way up." Indeed, when he got on the Stevenson there was no traffic whatsoever.

When the plaintiff entered the Stevenson Expressway he drove first in the right lane and then moved into the center lane. He was driving about 35 miles per hour; the maximum speed limit was 55 miles per hour and the minimum 40 or 45 miles per hour. Plaintiff noticed a station wagon on the right shoulder (on cross-examination he denied knowing whether the shoulder was wide enough for a car and said he did not know if the station wagon was on the shoulder or partly on the shoulder and partly on the expressway). As plaintiff continued driving west, he saw a man (Smith) walking on the right shoulder. Plaintiff next saw a car, about 8 to 10 car lengths in front of him blocking the middle and right lanes. The headlights were facing the right shoulder. Plaintiff did not know if the headlights were on; he did not see them. A man was motioning him to stop. Plaintiff had no trouble seeing either the car or the man. It was between daylight and dark outside.

When plaintiff saw the car and the man, he slowed down and stopped in the center lane about two car lengths from the car. The traffic was "awful light." After plaintiff stopped, some cars passed on the left. Plaintiff did not know how many cars passed because mostly he was watching the man but he was aware of vehicular traffic passing him in the left-hand lane. No traffic passed on the right.

When plaintiff stopped the car in the center lane he looked in the rear view mirror. He saw no vehicles behind him. Plaintiff, still in the center lane, put his car in park and took his seat belt off. He intended to get out to see if the man needed help. Plaintiff looked in the rear view mirror to determine if there was any traffic coming so he could open the door to get out. At that moment he saw a truck about two car lengths back in the middle lane coming straight at him. Plaintiff just grabbed the steering wheel and sat there because there was nowhere to go. The truck then hit plaintiff's car. The impact happened 25-30 seconds after plaintiff's car had stopped. At no time, even after the impact, did plaintiff's car make contact with the stalled car. His car was still a good car length away from it.

Plaintiff denied that he talked with any investigating police officers at the hospital. However, Police Officer Stokes testified that plaintiff told him at the hospital that an unknown vehicle stopped in front of him for some unknown reason, that he swerved, drove into the next lane to attempt to keep from striking the vehicle that was in front of him at which time the truck struck him. The trial court correctly instructed the jury that this testimony could not be considered with respect to any claims against Buttlar.

Buttlar testified both as a section 60 (Ill. Rev. Stat. 1977, ch. 110, par. 60) witness for the plaintiff and later in his own defense. When called as a witness for the plaintiff he testified that at 6 a.m. on the day in question he had been driving his car, a gray Chevrolet, in a southwesterly direction on the Stevenson Expressway. He was driving in the center lane at about 45 miles per hour. He had his headlights on. It was dark. The street lights were on and the visibility was good. The weather was extremely cold. The road was dry. There was very little traffic, nothing to his left or right. He did notice one car parked on the right shoulder of the road.

As he was driving along, he felt a terrific impact that spun his car around. After the car spun around, it stopped dead in the right and center lanes of the expressway, the headlights facing the right shoulder. It was two or three minutes after the car stopped before Buttlar got out of his car. In the meantime he stepped on the accelerator to get the car off the expressway but there was no response. He then put the car in park and turned his ignition key but discovered "it was dead." He saw that the headlights were out. He then noticed two headlights bearing down on him. He immediately got out and waved his hands so the driver would not hit him. He continued waving his hands until the headlights stopped about 25 feet from him. Buttlar then went to the hood of the car to see what was the matter. He did not thereafter see the two headlights. However he admitted that when he had his head under the hood he did not have the headlights under observation.

Buttlar did not put any flares out. He did not have any.

The impact had jarred the battery out of its saddle and the lead wire was jerked off one post. The steering apparatus had been smashed on the right side. The shaft was bent, and two rods were bent.

After Buttlar opened the hood of the car, he saw right away what had happened. He got a wrench to tighten the bolts and the lead wire and started to work on the battery. A man, presumably from the car parked on the shoulder, came over and helped. While Buttlar was working on the car, he heard cars going around in the left lane. No cars went by on the right shoulder. Buttlar and the man who was helping did at one point try to push the car when Buttlar's fingers were getting numb but they "didn't give it much effort."

About five or 10 minutes afer Buttlar started working on the battery cable, a truck driver came over and told him there had been an accident. Buttlar's head was under the hood at that moment. He looked up and saw the lights of a car in the center lane of the Stevenson Expressway. The headlights were in the position where he had seen them before he started looking under the hood. He and the man continued working on the car until he got the battery hooked up. Once he got the cable back on, the car started and he drove it off the expressway onto the shoulder. While the

car could then be driven, it was hard driving it because it was pulling to the right.

When Buttlar was recalled as a witness he testified that the running and mechanical condition of his car prior to January 12, 1974, was very good. He always tuned his car, changed the oil, put plugs in as needed and cleaned the battery and battery posts when they became sulfated. The battery was carried under the hood in a frame or saddle with a sort of steel wall around it about two inches high. He described the holding of the battery saying "on one end of that car is a protuberance that goes in, depressed in the battery, the battery is molded that way and on the other end is a loose lug with the same type of protuberance that goes into the battery. It depresses in the battery on the other end and that's about two inches from the bottom of the battery. There is a bolt, there is sufficient extension to that, it's a lug that goes into the depression of the battery on one end, that is a bolt held where you can put a bolt through and this bolt is screwed tight and to the car." The protuberance and the bolt hold the battery in the frame very securely. When the bolt is screwed in tight, the battery cannot move. He further testified on cross-examination that the battery was knocked loose.

Sutter testified that he was driving an empty tractor-trailer in the center lane of the Stevenson Expressway at about 6 a.m. on the morning in question. There was some traffic but very little. The road was dry but slippery. It was dusk, just becoming light. There was no haze but the "infrared lighting" produced a kind of shadowy effect. He had his truck lights on.

When Sutter first saw Buttlar's car it was in the left lane. Both Buttlar's and Sutter's vehicles were traveling at approximately the same speed—45 miles per hour. Sutter saw Buttlar's car spin. It appeared to hit the curbing on the railing, bounce across the highway and stop across the center and right lanes. Sutter was a good block and a half away (about 1500, 1800 feet) when he saw Buttlar's car spinning. When Buttlar's car came to a rest, Sutter saw Smith jump out of his own car and go towards Buttlar.

The moment Sutter saw Buttlar's car spin out, he put his four-way flasher on, took his foot off the fuel pedal and started fanning his brakes. There was traffic coming, not at a heavy pace but traveling part on the left-hand or inside lane. There were several vehicles which had been in the center lane and had gone around Sutter on the emergency strip to the right. Sutter kept fanning his brakes as the vehicle approached Buttlar's car. He intended to stop. He could not go in the left lane because the traffic was to the left. It was about a minute and a half from the time he started braking until the time he came to a halt.

When Sutter first noticed Buttlar's car, plaintiff's car was in the right-

hand lane, about 15 feet in front of the truck. He presumed plaintiff started braking at the same time Sutter did since he maintained the same interval. When plaintiff was 180-200 feet away from the stopped car, he swerved into the center lane 15 feet in front of the truck. Plaintiff's car was skidding at that point. It was Sutter's impression that plaintiff at that time was stopping his car right in front of him. When plaintiff's car came in front of Sutter's truck, Sutter "just stood on the brakes." He made no attempt to turn to the left or the right because if he had the truck would have jackknifed. Also he did not attempt to move the truck to the left because there were vehicles in that lane.

Plaintiff's car was about 25 to 30 feet away from Buttlar's car when Sutter's truck hit it. Sutter's truck was almost stopped at the time of the impact but he could not estimate the speed. Plaintiff's car was almost stopped at the time of the impact. Sutter did not know if he was completely stopped. After the impact, the vehicles came to a halt about 15 feet from Buttlar's car. Sutter got out of his truck. He did not see any objects lying on the ground around this area.

Sutter also testified that the shoulder was wide enough to accommodate a vehicle.

Prentice Smith testified that at the time of the accident his car was parked on the right shoulder of the southwest-bound lanes of the Stevenson Expressway because his car had been stalling. His car was a 1971 Datsun station wagon and the shoulder was "plenty wide" for one vehicle. While he was parked on the shoulder he noticed an object, which appeared to be a fender off an automobile, lying in the middle lane of the expressway just to the rear of Smith's car. It was hazy but not exactly dark outside and he could see the object clearly.

Smith then saw Buttlar's car come down the expressway. It got almost on top of the object he had seen in the road, then swerved and went out of control. Smith did not believe the car touched the object but admitted that he was not absolutely sure. The car was spinning around and sliding. It finally came to a halt crossways on the expressway blocking the center and part of the right-hand lane about 10 or 15 feet west of the object and west of Smith's car. As best as Smith could remember, the object was still in the same place it had been.

Smith got out of his car and went over to help. While he was at Buttlar's car, he observed Buttlar waving to the traffic, which was light. Some of the traffic went onto the shoulder to the right of the car and some went to the left. Buttlar waved for just a few seconds.

They then discovered the battery was loose. It had fallen over against the motor and one of the battery cables had come loose. Smith in response to the question "was there anything holding it up before it fell?" answered

"I don't think he had a bracket on it. It was just sitting on the battery plate." He guessed it became dislodged from the maneuver of the automobile.

Buttlar wanted to repair the car on the expressway but Smith told him they should get the car off before someone got hurt. He offered to help park it off the road and they started to do so. They did eventually push it off the road onto the shoulder; however, when the accident occurred the car was not completely off the road but was being pushed into the right-hand lane.

At the time Smith first observed Sutter's truck, Smith was standing to the right rear of Buttlar's car trying to push it off the expressway. Buttlar was standing by the driver's door, steering the car and trying to push the car.

When Smith first noticed plaintiff's automobile and Sutter's truck, the truck was partially in the center lane and partially in the left lane. The truck was slowing. He pulled over into the left lane to avoid the plaintiff's automobile in front. When Smith first observed the plaintiff's automobile, it was in the center lane about 10-15 feet in front of the truck. The automobile was almost on top of the object in the center lane. When plaintiff's automobile was about three to five feet away from the object, plaintiff locked his brakes. The tires were sliding. He started to skid and almost hit the object. As he almost got to the object he started to come out in the left lane, and just as he started to do this, the truck hit him in the rear. At this point the stalled car was approximately 10 to 15 feet in front of the truck. He denied that plaintiff's car ever came to a complete stop; it was slowing down then started to pick up speed. Smith admitted that in a deposition he had said that plaintiff's car stopped, that behind it was a truck which had pulled over to the left lane and the driver of the car started to go around to the left. Likewise while Smith stated at trial that about a minute elapsed between the time Smith went to assist Buttlar and the plaintiff skidded, in his deposition he said it was about two or three minutes.

As already noted, the jury found for all three defendants. It also answered in the affirmative a special interrogatory asking if the plaintiff had been guilty of contributory negligence. The plaintiff had objected both to the submission of the special interrogatory and to an instruction as to contributory negligence on the grounds there was no evidence of contributory negligence. The plaintiff also objected to the court's refusal to instruct the jury that plaintiff claimed Buttlar was negligent in failing to display lights on the highway; in operating a vehicle without properly securing the battery; and in stopping the vehicle on the highway in violation of statute.

## I

Plaintiff first contends, relying on Judge Rizzi's opinion in *Albaugh v. Cooley* (1980), 88 Ill. App. 3d 320, 410 N.E.2d 873, *appeal allowed* (1981), ___ Ill. 2d ___, that the judgment entered should be vacated and the cause remanded for a new trial because the use of the special interrogatory was unconstitutional. Judge Rizzi stated in *Albaugh* that it was his opinion that section 65 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 65) is unconstitutional as a legislative encroachment upon the inherent judicial power to adjudge, determine and render a verdict. Judge Rizzi objected to that portion of the act requiring a trial judge, upon request of any party, to submit a written special interrogatory to the jury upon any material question of fact and further requiring that when the special finding was inconsistent with the general verdict the special finding would control. It was Judge Rizzi's opinion that the decision to give a special interrogatory should be a matter left to the judicial discretion of the judge so that the refusal to give a tendered interrogatory would not be error unless a party could show resulting prejudice. Furthermore the answer to the special interrogatory would be advisory only.

Although Judge Rizzi delivered the opinion of the court in *Albaugh*, his remarks on the constitutionality of the statute were not part of the holding of the court since the concurring judge in his opinion specifically stated that he saw no need to decide whether the statute was constitutional and the dissenting judge stated the statute was constitutional. We need not consider whether we would adopt Judge Rizzi's opinion in a proper case since even if we did it would not affect the result here. Here, unlike *Albaugh*, the verdicts were consistent so that statutory provision requiring that the special interrogatory in case of conflict govern is inapplicable. Contrary to plaintiff's apparent belief, Judge Rizzi did not suggest that the giving of special interrogatories was unconstitutional. Indeed his opinion was based upon the premise that the giving of special interrogatories was part of the inherent judicial power of the court which could not be encroached upon by the legislature.

## II

■■■ The plaintiff next contends that the general verdict and the answer to the special interrogatory are against the manifest weight of the evidence and the plaintiff is entitled to a new trial. Questions of fact in actions for injuries arising out of the operation of motor vehicles are to be determined by the jury and it is its function to pass on conflicting evidence, the credibility of the witnesses and the weight to be given to the testimony. (*Lode v. Mercanio* (1979), 77 Ill. App. 3d 150, 395 N.E.2d 1014; 4A Ill. L. & Prac. *Automobiles and Motor Vehicles* §304.) Questions of negligence and contributory negligence are ordinarily and preeminently questions for the jury to determine. *Borus v. Yellow Cab Co.* (1977), 52 Ill.

App. 3d 194, 367 N.E.2d 277; *Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707; *Workman v. Goldford* (1967), 86 Ill. App. 2d 403, 230 N.E.2d 574; *Hays v. Place* (1953), 350 Ill. App. 504, 113 N.E.2d 178.

■■ The plaintiff contends that he was struck in the rear by Sutter's truck while he was avoiding Buttlar's automobile which was standing unlit and unmarked on the expressway and that under those circumstances either Buttlar or Sutter and his employer must be found liable for plaintiff's injuries as the events which led to his injury were beyond his control. Proof of an accident or collision does not of itself prove negligence as a matter of law (4A Ill. L. & Prac. *Automobiles and Motor Vehicles* §305), and the mere fact that two drivers are being sued does not mean one or the other driver must be held liable. (See *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 382 N.E.2d 239.) Even if we were to assume that one or both of the defendants was negligent, it was for the jury to decide if the plaintiff was negligent in parking on the highway in violation of statute (Ill. Rev. Stat. 1973, ch. 95½, par. 11—1301), for 30 seconds, if we believe plaintiff's testimony, or for five to 10 minutes, if we accept Buttlar's testimony and if we assume that the unidentified headlights which he saw were those of plaintiff's car. This is particularly true since Sutter and Smith both testified that other vehicles could and did go around the disabled car both on the right and the left and the plaintiff himself testified that the traffic was light. Likewise it was for the jury to decide whether the testimony of Officer Stokes, Sutter and Smith that the plaintiff changed lanes in front of the truck was more credible than the plaintiff's testimony that he stopped and parked in the center lane of the expressway. If it determined that their testimony was more credible it was for the jury to decide whether plaintiff was negligent in swerving into the truck's lane of traffic immediately in front of the truck since a driver may not change lanes until he has first ascertained that such movement can be made with safety. Ill. Rev. Stat. 1973, ch. 95½, par. 11—709(a); *Hasselbacher v. Mendell* (1970), 119 Ill. App. 2d 90, 255 N.E.2d 484, *appeal denied* (1970), 43 Ill. 2d 397.

■■ Furthermore, the evidence does not even show as a matter of law that any of the defendants was guilty of negligence contributing to the accident. It is true that Sutter's truck ran into plaintiff's automobile, but it has frequently been held that a driver running into the rear of another vehicle on an expressway is not necessarily negligent as a matter of law. (*Larson v. Thomashow* (1974), 17 Ill. App. 3d 208, 307 N.E.2d 707; *Nei v. Contracting & Material Co.* (1968), 93 Ill. App. 2d 226, 236 N.E.2d 264.) Thus it was for the jury to decide whether Sutter kept a proper distance between his truck and the one in front in view of the speed of the vehicles and the prevailing traffic conditions, whether his speed was excessive under the circumstances and whether he applied his brakes as quickly as he should have.

Likewise, in view of the conflicting testimony as to the length of time Buttlar allowed his car to remain on the expressway, it was for the jury to decide if Buttlar failed to remove the car within a reasonable time. But even if the jury should have determined that Buttlar acted unreasonably in this regard, it is difficult to see how either this failure or his failure to place flares could have been a cause of the plaintiff's injuries since, according to the plaintiff's own testimony, the plaintiff was able to stop his car over two car lengths away from the disabled car. Additionally, the evidence is overwhelming that plaintiff could have moved his car either into the left lane or onto the right shoulder, and plaintiff nowhere in his testimony suggested that he remained in the center lane because of traffic in the other lanes.

Finally, the plaintiff contends that the weight of the evidence also establishes that Buttlar is liable to the plaintiff under the rescue doctrine, citing *Seibutis v. Smith* (1980), 83 Ill. App. 3d 1010, 404 N.E.2d 950. *Seibutis* does not support plaintiff's argument. In *Seibutis* the rescuer parked her car on the shoulder of the road, then returned to the highway to assist persons involved in a previous accident. In the present case the plaintiff, according to his testimony, parked in the center lane but never got out of the automobile, unlike Smith whose car was parked on the shoulder and who was helping Buttlar.

■■ Furthermore, at no time during the trial below did plaintiff raise this theory or ask that the jury be instructed on it. The theory upon which a case is tried in the lower court cannot be changed on review and an issue not presented to the trial court cannot be raised for the first time on appeal. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417.

### III

At trial, plaintiff tendered an issue instruction which read in part:

"The plaintiff claims he was injured and sustained damage while exercising ordinary care and that the defendant, OTTO BUTT-LAR, was negligent in one or more of the following respects:

(a) Failed to keep a proper lookout;

(b) Stopped his vehicle on a restricted access expressway;

(c) Failed to display lights on the highway;

(d) Failed to set out flares or other signals that his car was stopped on the highway;

(e) Failed to maintain control over his vehicle;

(f) Operated a vehicle without brackets to hold the vehicle's battery upright;

(g) Stopped his vehicle on a highway in violation of Ill. Rev. Stat., Ch. 95½, 11—1301, 1302."

After the court rejected paragraphs (c), (f) and (g), plaintiff orally

amended paragraph (f) to read "operating a motor vehicle with battery unsecured." This amendment was also rejected. The instruction minus the stricken paragraphs was given to the jury.

Plaintiff argues that if the car lights had been lit, he and Sutter arguably would have been aware of the disabled car sooner. But the evidence is uncontradicted that neither the headlights nor taillights would have shined in an easterly direction. Furthermore, as we have already noted, according to plaintiff's testimony, he saw the car in time to stop. Sutter who was traveling behind plaintiff saw Buttlar's car spin out. Finally, it is undisputed that the car lights were off not by Buttlar's choice but because the car was disabled.

■■ The court properly refused to give paragraph (f) either as originally set forth or as amended since there was no evidence in the record tending to show that the battery was not properly secured before the spin out. The mere fact that the battery fell over after the spin out would not, without more, permit the jury to find that the plaintiff negligently failed to secure the battery. Instructions must be predicated upon evidence and where not based upon evidence should not be given. (*McCullough v. McTavish* (1978), 62 Ill. App. 3d 1041, 379 N.E.2d 880; *Probus v. Brown* (1975), 33 Ill. App. 3d 639, 338 N.E.2d 231; *Darby v. Checker Co.* (1972), 6 Ill. App. 3d 188, 285 N.E.2d 217.) Finally paragraph (g) was properly refused because under the undisputed facts of the case neither statute was applicable. Section 11—1301(c) provides that the section does not apply to any vehicle which is disabled while on the roadway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position. Section 11—1302 merely permits police officers to remove illegally parked cars. In any event, plaintiff's contention that Buttlar negligently left the car on the highway without making a reasonable effort to remove it was presented in paragraph (b) of the instruction which was given to the jury.

Accordingly the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.